## OVERMAN WHEEL CO. v. GRIFFIN.

### (Circuit Court of Appeals, First Circuit. May 7, 1895.)

#### No. 122.

1. MASTER AND SERVANT— NEGLIGENCE—DEFECTIVE PREMISES—ADMISSIBILITY OF EVIDENCE.

A night watchman was found dead under an unrailed bridge connecting two buildings, which he customarily crossed in the performance of his duties. *Held*, in an action to recover damages for his death, evidence was admissible which tended to show what kind of man he was in respect to health, vigor, activity, and sobriety, and his bodily and mental peculiarities.

2. SAME—INSTRUCTIONS—DUE CARE AND DILIGENCE.

Defendant requested an instruction that unless deceased was as careful and diligent to avoid danger as men of ordinary care and prudence would have been, "under the same or similar circumstances," he failed to exercise the care and diligence which the law required. The instruction given by the court was that plaintiff must show that the deceased was in the exercise of ordinary care and diligence, and that ordinary care was the care "which reasonable men exercise under ordinary circumstances." *Held*, that the requested instruction was correct, and should have been given either in terms or in substance, and that the instruction given was erroneous, in that it substituted "ordinary circumstances" for "similar circumstances."

3. TRIAL—INSTRUCTIONS—DUTY OF COUNSEL.

Where counsel proposed a definite and proper instruction, but found that the court gave something very different, *held*, that he might well have understood that the change was no mere inadvertency of expression on the part of the court, and that he was therefore not required to call its attention to the matter at the time, as otherwise, under the rule of the court, would have been his duty.

In Error to the Circuit Court of the United States for the District of Massachusetts.

This was an action by Mary Griffin against the Overman Wheel Company, to recover damages for the death of her husband, John Griffin, which occurred while he was in the employ of defendant. Upon the first trial the court directed a verdict for defendant at the close of plaintiff's testimony, and entered judgment accordingly. Upon a writ of error sued out by plaintiff to this court, the judgment was reversed. 9 C. C. A. 542, 61 Fed. 568. Upon a second trial, plaintiff recovered a verdict and judgment, and defendant has now sued out a writ of error.

The action was founded upon the Massachusetts statute known as the "Employers' Liability Act" (Act 1887, c. 270). The facts were as follows:

John Griffin was a night watchman at the defendant's factory in Chicopee Falls, having entered its employ in February, 1891. It was his duty as such to make rounds of a certain number of the defendant's buildings once every hour during the night, and to press several buttons, which were connected by electrical appliances with a watchman's clock or dial in the defendant's office, upon which a mark was registered every time a button was pressed. Griffin had seventeen of these buttons to press, numbered consecutively from 31 to 47, inclusive. The principal building through which Griffin passed in the performance of his duties was known as "Mill No. 2." Another building, known as the "Rubber Mill," had been erected during Griffin's term of service and a short time before his death. It was connected with mill No.

2 by a bridge 4½ feet wide, about 15 feet long, and about the same distance from the ground. Only the stringers and floor of the bridge were completed. The railing was in process of construction, but had not been erected. It was in dispute as to how much, and by whom, the bridge was used, but the evidence conclusively showed that the bridge was not used for the purpose for which it was designed until after Griffin's death. Before the rubber mill was occupied for the purpose for which it was built, three buttons were placed in different parts of the building, and connected by wires with the watchman's clock in the office, and, about four weeks before his death, Griffin began to cross the bridge, and push the button in the upper story of the rubber mill, and then recross the bridge and finish his trip. There was evidence that the order in which the watchman pressed the buttons was in accordance with the plan of the electrician who put up the buttons, and that the route adopted by the watchman was the most direct way to reach the buttons in the order established by the electrician, but the only order of the superintendent to the electrician was to put "three buttons in the rubber mill, two in the first story and one in the second," and there was no evidence of instructions or authority for him to change the buttons in mill No. 2. No officer of the Overman Wheel Company, nor any persons whose principal duty was superintendence, knew the watchman was using the bridge. On the night of the accident he was seen to start on his round at 1:30 a. m., pushing button No. 31 in the engine room. He was not seen again until he was found about two hours afterwards lying on his back, on the ground, dead, between the rubber mill and mill No. 2, east of the bridge, with his head towards mill No. 2, and his feet toward the rubber mill, and his lantern, which was crushed so that the oil ran out of it, by his side. There was a cut about two inches long on the back of his head, in which there was sand and gravel, and his skull was fractured. The watchman's clock or dial in the office showed that on the 1:30 o'clock trip buttons Nos. 31, 32, 33, 34, and 35 had been pushed, and button No. 36 had not. The bridge in question sloped somewhat from mill No. 2 to the rubber mill. It was in evidence that the night on which Griffin met his death was cold, dark, cloudy, and frosty. There were no railings or guards on either side of the bridge. About a week before the night of Griffin's death a small engine had been placed in the machine room on the ground floor of mill No. 2, from which there was an exhaust pipe which came out of the ground floor of the mill through the window of the basement, about 16 inches from the ground, and about 18 inches west of the bridge, and extended about 18 inches beyond the window. On the night in question the wind was blowing from the northwest, and it was in evidence that the steam from this exhaust pipe would envelop the bridge at least to some extent.

The first assignment of error related to the admission of the testimony of one Henry Dubuque as to the habit and customary way of John Griffin in regard to doing his work, and what kind of man he was. The testimony objected to was as follows:

"Q. Now, Mr. Dubuque, in what way did Mr. Griffin do his work? A. He was a man— (Objected to.) The Court: What do you mean by that? Mr. Carroll (counsel for plaintiff): I mean his habit and customary way of doing his work, and I propose to follow that up, if he answers that, by inquiring what kind of a man he was. The Court: He may answer that. Do you object? Mr. White (counsel for defendant): Yes, sir. Q. What was Mr. Griffin's customary way and manner of doing his work? A. He was right up to the handle. Q. He was right up to the handle? A. Yes, sir. Q. What do you mean by that? A. He was a man that was very prompt about doing his work, and right up on time. Q. What kind of a looking man was he,—that is, what size? A. I should judge six feet high. Q. And as to his agility and quickness? A. Yes, sir; he was a very quick man,—very quick motion. Q. All the time that you knew him did you know him to start exactly upon time? A. What, sir? Q. All the time that you knew him to work there as a watchman in that mill, did you know him to start on the exact time, at the same time, on the half hour? A. Yes, sir. Q.

Never knew him to fail? A. Always start on the half hour, and always start the same time, as far as I know. Q. And, as far as you know, did he get back at the same time? A. Yes, sir. Q. And during the rest of the hour where did he stay? A. In the engine room, right there where he drives the first pin; there is where the clock was. Q. What was his appearance and conduct on this particular night,—the night of the 5th of January? A. I don't understand exactly what you mean? Q. How did he look, how did he act, on the night of the 5th of January? A. The same way as ever. Q. What about his sobriety? A. Just the same; I didn't find any difference to him that night than any other night. Q. Was he a perfectly sober man? A. Yes, sir."

The plaintiff's counsel claimed in his argument to the jury to have proved by the foregoing testimony that Griffin was habitually careful in doing his work, and that, therefore, they should find that he was in the exercise of due care at the time of his death.

Luther White, for plaintiff in error.

James E. Cotter (James B. Carroll, on the brief), for defendant in error.

Before PUTNAM Circuit Judge, and NELSON and WEBB, District Judges.

WEBB, District Judge. At the conclusion of all the evidence, the defendant in the court below moved that the jury should be instructed to return a verdict in his favor. To the denial of this motion he excepted, and the exceptions were allowed. This brings before us all the evidence at the trial. Upon careful consideration of it, this court does not consider that the instruction asked would have been proper, or that its denial was erroneous. The testimony of the witness Dubuque, admitted under objection, and excepted to, was competent for the purpose of showing to the jury what kind of a man the deceased was, in respect to health, vigor, and activity, and his bodily and mental peculiarities. It was also admissible to show his condition as to sobriety and apparent health and vigor immediately before his death. If, in the course of argument, the plaintiff's counsel made unwarrantable use of that evidence, the defendant should have at once called the attention of the court to the objectionable argument, and requested its prohibition.

Sundry requests for instructions on points of law were presented to the presiding judge at the trial, as to which, in the refusals to give the instructions asked for, and, with one exception to be noticed hereafter, in the instructions given, no error is perceived. Among those requests was one that the jury should be instructed that Griffin "was in law bound to exercise the due care and diligence of a prudent and careful man, and, unless he was as careful and diligent to avoid danger as men of ordinary prudence and care would have been under the same or similar circumstances, he failed to exercise the care and diligence that the law required of him, and the plaintiff cannot recover." Upon this part of the case the jury were instructed: "The plaintiff must show that the deceased was in the exercise of ordinary care and diligence at the time of the accident. Now, it has been said, with respect to what constitutes ordinary care, that ordinary care is the care which reasonable men

exercise under ordinary circumstances." The requested instruction should have been given, in terms or in substance. The conduct of prudent men, under similar circumstances, was the rule of standard of prudence required. Northern Pac. R. Co. v. Herbert, 116 U. S. 642, 656, 6 Sup. Ct. 590. The instruction given substituted ordinary circumstances for similar circumstances, and was erroneous. "Ordinary circumstances" would not convey to the minds of the jurors the necessity of comparing the conduct of the deceased, under the circumstances shown by the evidence, with what would be the conduct of prudent men under the same or similar conditions. We attach no importance to the expression "reasonable men" instead of "prudent men." Having expressly requested definite and proper instruction, and finding something very different given, the defendant's counsel might well understand that the change was no mere inadvertency of expression on the part of the court, and was therefore not required to call the attention of the court to the point at the time, and ask a correction, as otherwise, under the rule of the court, would have been his duty. Judgment is reversed. The verdict is set aside, and a new trial ordered.